Commissioner of the Georgia Department of Community Health. Good morning, Your Honors. Are you ready? Yes. We'll hear first from counsel for L.W. Thank you, Judge Rosenbaum. Georgia's Medicaid program serves over a million children, many thousands of whom have complex medical conditions. That means the state has to make hard decisions. Oh, I'm sorry to interrupt. I'm sorry. I thought we're actually hearing from the Commissioner of the Georgia Department of Community Health. That's right. Apologies. Thank you, Mr. Norris. Mr. Bergethon. I'm just having one of those days where I'm the last day of our sitting. Okay. Go ahead, Mr. Bergethon. Apologies. The state has to make hard decisions about how to allocate finite resources, including skilled nursing care. One of those decisions that was not at all difficult was the policy at issue here, and that's that the state won't increase skilled nursing hours unless there's been a change in the patient's condition. The district court enjoined the state from applying that policy here and ordered it to do a five-fold increase in the number of nursing hours for LW, even though no one disputes that there was no change in his condition. Can I ask a clarifying question right off the bat? Is the policy that within the year or the kind of evaluation term, that change will not be made? Or is the policy ever? The policy is for a change request. So the way that this works is, you know, you're initially approved for the aid. Then there are periodic reviews. It can happen between six or 12 months. If I'm wrong about that, I will correct on rebuttal. In the middle of that, beneficiaries can ask for a change. And the policy is, if you're asking for a change independent from one of those reviews, that you have to show a change in condition. But at the time of the periodic review, if it turns out that the requested amount before and approved amount before was not enough, at the time of the periodic review, the claimant can ask for more hours without a change. Is that correct? The focus would still be medical necessity. But to be clear, there have been instances during a periodic review where the department will realize or Alliant, who's the department subcontractor, will say, oh, there were things we didn't look at. We need to make an adjustment. Right. Facts would have had to show, even with no change in the patient's condition. Let's say it's January 1. I know it's not, right? But they approve on January 1, 10 hours per week is plenty. And then once the patient receives these 10 hours of skilled nursing care, 10 hours per week, it becomes apparent that that does not actually meet their needs. So what you're saying, the policy is until, if it's a 12-month cycle, until January 1 of the next year, they have to manage through that however they can. But as of January 1 next year, they could say, although the patient's condition is the same, it became apparent that what was actually needed was more than we realized before. Well, Your Honor, I think that's partially correct. It depends on what we're talking about when you say that the patient needs more. And I think that the focus of this case is, what does that mean? Even assuming there's a private right of action here. The problem is, so we've got this Moore case, right? Moore v. Reese. And it says that the pivotal issue, and I'm just going to quote from it, the hours are different, but it seems to match this case exactly. The pivotal issue is only whether 84 hours are sufficient in amount to reasonably achieve the purposes of private duty nursing services to correct or ameliorate Moore's condition. In such disputes between the state and Medicaid patients, our precedent teaches that the state may present its own evidence of medical necessity, which may create issues of material fact. And then it says that the record in that case presents material issues of fact over what amount of private duty nursing hours are medically necessary for Moore, which must be resolved by a fact finder. So isn't this just a question for a fact finder to look at and say whether the hours that you've identified, you've identified 21 hours, whether that's sufficient or not? No, I don't think so, Your Honor, for a couple reasons. One, we don't think, this wasn't an issue in Moore, no one put it at issue, we don't think there's a private right of action. What is it? What is it? Oh, the private right of action. We don't think there's a private right of action at all. Okay, well let's talk about that because that was not raised at all until your reply brief here. That's correct, Your Honor. That's a forfeiture. Your Honor, obviously, ideally, it would have been raised earlier. There's a number of factors that influence that. I understand, but everybody could say that. Right, everybody can say that. The one thing that's clear is the court has discretion to still consider it and I think there's two reasons why it should here. Number one is it's a clean legal issue and it's an easy legal issue. The Supreme Court has made this clear. There's lots of standards that the Supreme Court asked lower courts to apply that are really tricky to work through. This is not one of them. It hasn't even been briefed. We haven't, I mean, we have a lot of cases. You need to go to something else. Yeah. Okay. I'm just telling you, you need to go to something else. What's your other, why doesn't Moore, why don't we just follow Moore and just ask, what about this for a fact finder? The reason that this isn't for a fact finder is Moore and MH after it focused on two things. They focused on policies and then they, then there was an assumption that you could dispute, if there's a dispute over the hours, the court could address that. I think, I think the problem here is that there's no daylight here between the policy and the dispute. This is a dispute over the policy because. Well, I guess, here's the way I understand it. You're saying we have a policy and they're saying we're not getting enough hours. Right. How, I mean, we could, there could be a world where your policy makes perfect sense. It might make perfect sense for 99.9% of cases, but it could also still be true that in this particular case, this particular patient isn't getting enough hours, right? Yeah. I take your point, Your Honor, and I think there are cases where maybe there's a policy that's largely reasonable and you have edge cases and that might change the analysis. The reason I think this is different is if the policy, if this decision here, if this isn't reasonable under the policy, no decision is reasonable under the policy. Well, I don't know about that. I mean, I guess I read the nurse's affidavit and there's no explanation from the state whatsoever about why 21 hours is sufficient. So, the only thing you're saying is that we gave him 21 hours. He hasn't identified a change in medical status. So, he gets 21 hours. The way that, the way it's supposed to be resolved under Moore, I think, is the state's supposed to come in and say, here's why we thought 21 hours was sufficient. And then you could say, and then we've got a policy that says unless he identifies some change in medical status, we're going to keep giving him 21 hours. Sorry, Your Honor. I think that may be right when there is an actual dispute, you know, we think your hours are too high because. I think it's different here because this is one of the rare examples of a mechanical application of a policy. And so, there was no, we think Dr. Champagne's recommendation was wrong for a number of reasons, but this mechanical application of the policy was just, we will not do this for a change request unless you've shown a change. But I do want to make clear, at the front end of this, this wasn't just an arbitrary decision. This went through the process with Alliant that was discussed at NMH, and that the court at NMH held to be reasonable. There's a number of healthcare practitioners looking at the patient's case and saying, we give this a number of points, and so here's your number of hours. But what I would say here, I think. But in NMH, and I was on the panel in NMH, we said everything the department does, all its regulations are reasonable, everything's fine. But then we say, although individual patients might argue that the number of approved hours that they receive does not satisfy the standard, that question is not before us. So, we have a caveat where we say everything's reasonable, everything's fine, but in an individual case, an individual might argue that the number of hours they're receiving doesn't meet the Medicaid standard, and we're not addressing that in NMH. Isn't that what this case is about? Is he saying 21 hours doesn't meet the standard? I still think it's about the policy, but even if you think I'm wrong, here's why I think we should prevail. Let's just say I agree and say the policy's reasonable. Don't then I have to ask whether 21 hours is sufficient to meet the Medicaid standard? I don't think so, for two reasons. Number one, the Medicaid Act gives the states broad discretion to state policies. They have to state broad-reaching policies, and there's no... But the standard, and what we said in NMH, is that it still has to ameliorate the condition, right? That's correct. And so if it turns out that it's not ameliorating the condition because there was a mistake made, then as Judge Brasher was saying, why doesn't the recipient have the opportunity then to challenge it in court that your finding of necessity was incorrect or your finding of amelioration was incorrect? Sure, Your Honor. Assuming that issue is before you, here's why I think we should prevail. There's no question, number one, that L.W.'s condition was ameliorated. He was on 21 hours of nursing care for a year. Well, let's talk about that. With no change in condition. I'm sorry. He had 21 hours of nursing care per week, right? And he has a condition that literally requires 24-hour per day monitoring, right? I think my time's up, Your Honor, but I think that's correct. Yes, it is correct. All right. So 21 hours a day, you all were expecting his parents by themselves to monitor his condition while still sleeping and somehow working. And on top of that, we have testimony from the mother that because she had no sleep, because she was caring for him for 21 hours a day, that she slept through alarms, that his glucose level descended so low that he was at risk for seizures and even death. So was his condition really ameliorated? Two things, and I think they're both critical for our argument, Your Honor. Number one, there is no argument that his condition changed. Was his condition ameliorated? Yes, we would say it is. Let me ask a question that I think zooms it out. Let's say that everything that Judge Originbaum stated, including every single thing, is absolutely true, right? Let's just assume that for purposes of argument. I understand that you guys have disagreements, but just assume it. The question I think is, can a state have administrative policies that sometimes result in an individual not receiving sufficient skilled nursing care for a period of time? Under the statute, can a state have administrative policies that sometimes result in that? Yes, absolutely. And MH says this. The state can draw rational distinctions between patients as long as they're not based on the nature of the condition. That's what the state has done here. And so that pretty much obliterates that if you say, well, the state can draw rational distinctions, but we're still going to examine it de novo in federal court. Well, what Moore says is it's a fact question, right? Well, Your Honor, even taking all of these assumptions is true. If we're just looking at this as a balancing of hours, the key factor here is that the balancing is based on the parent's needs and not the child's needs. The Medicaid act— That's still—I think you still have to—I think that's still getting to the merits. I think for you to win, you have to assume that somebody—Megan, not LW— somebody has 10 hours of skilled nursing care per month, and they really do need 100. They really do. You have to be able to say, that doesn't matter because our policy is our policy, and they'll get their chance later. I want to make sure that that's what you're saying. No, it's absolutely not. If they really need it, under the Medicaid act, what that has to mean is that it's medically necessary. And if that's shown— And how can they not—how can someone not have a chance to bring a claim, even if their condition hasn't changed, if that contention is true? Under the Medicaid act, they have to have those needs satisfied. Well, under the Medicaid act, again, the state has to just make reasonable policies, and a policy of deciding— No, you just—that's the opposite of what you just said. I mean, so Judge Grant keeps asking you, is it okay if you have policies even if people don't actually get the care that they need? And then you just said, no, they need to get the care that they need. And I apologize, Your Honor, if I'm not being clear enough. I think there's a lot encompassed within the care they need, and I think it's important that we focus on what the provisions at issue here actually require. There's a whole spectrum of care for a seriously ill child. Any parent with kids knows just under regular circumstances, it's a challenge to juggle child care and kids. When you add a serious illness, that significantly increases it. A large number of those care tasks, though, don't fall into the heading of what we're discussing here. No, I agree. The bigger problem that I'm trying to lock down, though, is I understand that you guys are justifiably concerned about kind of floodgates of litigation. If you can request a change without a change in condition, then people who really don't need that change will bring it in, etc., etc., etc. But what I'm saying is I think to have a policy like this that means someone can't even bring this claim and state that their needs are not being met under the statute, you have to say, under our rules, sometimes someone who needs this care will not get it until the next administrative review period. And that is sad but true in how it happens, and the federal statute allows us as a state to have policies that may unwittingly sometimes result in that situation. I think two points. The federal statute does allow that, but two, practically that's not how it would play out in the vast majority of circumstances because when we're talking about someone needing the care, that has a very specific meaning. For the Medicaid Act, generally it means it's medically necessary. For these provisions, it means there's a certain amount of the child's day that if they're not receiving care by a specially trained person who is doing specialized things, then their condition will worsen. So what does a caregiver have to show at the outset? What do they have to plead in order to get over the hump of this no change in condition policy? I think at the bare minimum, Your Honor, they have to show it's medically necessary versus it's convenient for the parents. No one is diminishing the parent's task here, but the Medicaid Act simply doesn't account for that slice of things. There may be other social programs that do. I just tell you, I feel for you on that, in the sense that this can't be a babysitting service or something, but that doesn't seem to be what's going on here. It seems like what the parents are saying is that 21 hours was never enough. We've kept our kid alive through Herculean efforts of providing care 24 hours for him that has damaged our own health, was barely possible, and this level of care can't continue going forward. And so they don't seem to be saying, gosh, it would be easier for me if I had a nurse watch my kid, as so much as the only way the kid has been alive with 21 hours is through efforts from the parents that are just not sustainable going forward. Why isn't that what they're saying? For two reasons, Your Honor. Number one, I think that, number one, it's unclear how that would even be an administrable question for Medicaid. When we talk about medical necessity. What they're saying is they're saying 21 hours is not enough, and I guess your point is we've said 21 hours is enough, even though there's nothing in the record explaining why. Well, there's also nothing in the record explaining what the nurses do, by the way. There's just nothing in the record. You guys did nothing to put anything in the record. So that would be good next time if there were something in the record. It might help you win a case. Point taken, Your Honor. I think it's important to remember, number one, and it's sort of gotten lost here, that there is a whole process for challenging this. I think, Your Honor's question, some of them are sort of assuming that the 21 is just arbitrary and you're stuck with it. That's what's in the record. But that's not true at all. I believe you in some theoretical world. I'm not even talking about whether the 21 is sufficient. If you don't think it's sufficient, there's a whole process where you can go and dispute that. You can take that up through the state court system. You can go to the U.S. Supreme Court with that. The wards here just didn't take that. That's your exhaustion argument. No, I'm not making that as an exhaustion argument. I'm just showing that this isn't some process where you sign up, the state gives you some number, and you're locked into that. That is not the case at all. You can challenge it at the front end. Do you have to challenge it at the time that the initial decision is made to hear 21 hours? Would they have had to challenge it at that time? Or could they have said, you know, that's tough, but I think we can make it work. And then three months later, they realize it's not working. Could they still have invoked the process that you're describing? Or is this type of action their only shot? I think their options in that scenario would be either to challenge it up front through their administrative proceedings or ask for a change. If you ask for a change, that has to be tied to a changing condition. So you cannot ask for a change on the theory, you gave us a lower number of hours than it turns out we actually need. It has to be you gave us a lower number of hours, but there's a change in condition that warrants four hours. Well, again, that can also be accounted for in the periodic review process because that is the provider. So the provider of skilled nursing care saying we need to re-up. And they can say, look, if this is not working, they present that case, and that's considered, and you have another opportunity to challenge that. I think what's kind of getting lost is that we're just looking at a very narrow slice of this, and that's the policy that if you ask for a change in between them, then you've got to show a change in conditions. I think at the very least that policy is reasonable. Do you know when, sorry, one more question. Do you know when, in this case, the next periodic review would take place? You guys have been in court a long time already. I don't. I can ask counsel who handled that below at the table and let you know that on rebuttal. Thank you. All right. Thank you, Mr. Bergethon. And we took you over quite a bit. Mr. Norris, I'm going to try to make up for that by giving you an extra ten minutes. Please do not feel like you need to use them. There's no need to snatch defeat from the jaws of victory. Thank you. I appreciate that. Good morning. May it please the Court. I think that, Judge Brasher, you're right on here that more is the controlling precedent, that more looks squarely at the EPSDT provision, says that the state's burden here is to provide all necessary care to correct or ameliorate the condition. Congress put that in the statute in 1989 as a significant amendment to the Medicaid Act. I think it's quite a clear mandate. I think this Court took that to be the case. And in more, there had been a grant of summary judgment. And this Court said, no, where there's a dispute, we need to actually have a trial, and we need a weighing of the evidence. And as you all have pointed out, we provided very specific evidence about this child's condition, the sort of insidious nature of it where he has to be fed raw cornstarch at least every three hours because if he isn't, if he doesn't receive that, his health precipitously declines. Here's my concern, which may not be shared by my friends, but in any event, it seems to me that this particular policy was not litigated at NMH, right? And I'll say at the outset, you have a very sympathetic client. It seems clear to me that, as a matter of fact, he very likely needs more care, right? That's not my decision to make, but it seems that way to me. But the problem is that I think there was here, and tell me why I'm wrong, I think there was here a proceeding in which the amount of care that he needed was litigated, and a decision was reached on the basis of facts in that proceeding. The parents did not disagree at that time, at least publicly. Maybe they privately wondered, but they didn't go through a process to challenge that decision at that time, right? You're talking about the review process? The initial determination. I'm talking about the initial determination of 21 hours. They didn't challenge that decision at that time, kind of using any of the means available, right? Right. And now they have realized later that maybe they should have, or that he really does need more care. And again, I'm sympathetic to that, but I think the problem is that I can understand why, especially given the periodic review process where that can be reevaluated later, I have a hard time understanding why any parent or caregiver who disagrees with a decision subsequently should be able to raise it at any time, rather than waiting for the periodic review. I think that in a sympathetic case like this one, it makes a lot of sense. But if you think about any caregiver being able to raise a separate claim a month later, and then a month after that, they maybe think it's changed, right? It leads to this potentially interminable review process that's outside the policies that I think could be administratively troublesome and actually detract resources into litigation that would be better spent, frankly, providing care. And even though in some situations any rule might lead to unfortunate outcomes in a situation here or there, why can't the state have kind of a process for dealing with these cases? So I think that the reality is that in our perception of health care coverage, insurance coverage generally, is that you're kind of stuck with whatever your insurance company allocates or authorizes. There are processes to challenge those things, but by and large, I think most people's experience in the real world is what you get is what you get. EPSDT is different, and it's always been different. Congress made clear that when they did the amendment in 1989, they were not happy with what the states had done. Literally, they'd done nothing. The program was created as a result of physical exams for the Vietnam War, where they found a bunch of young men who had conditions that were otherwise correctable. And because they hadn't been corrected, because there hadn't been early intervention, we had a bunch of young men who couldn't serve. Also, as a policy matter, we want our young people to grow up and be all that they can be so that they can be productive citizens, taxpayers, et cetera. So Congress set out for the states, through the Medicaid program, a very specific idea that we were going to intervene early and often with kids and that we were going to correct or ameliorate their conditions and that that had to be delivered promptly. That's quite different than what you sort of experience generally, I think, in the world of insurance. So when we are expecting people to know kind of what their rights are and understand the process, I don't think that's actually accurate generally because I think in this case in particular, they had moved here from Virginia. They weren't familiar with the Georgia program. They got what they got. When it came time to reauthorize, which is its own process, the nursing agency has to collect a bunch of documentation, a bunch of signatures from physicians. They submit that. Unless you are savvy and understand how this works and the whole sort of process and the purpose of GAAP, it's very easy to see this all the time for you to miss your opportunity, your window for appeal. I mean, I get that, and that's why I say this is incredibly sympathetic, and if I could wave a wand, I would do it. My concern, though, is that as we look at this question, we haven't done a merits review, nor has anyone, and we have to presume that your client could be right or your client could be wrong. And that means that we have to presume that even someone who ultimately is incorrect about what level of care is required under the law could bring a claim in this situation as long as they assert that the appropriate level of care is not being provided. That's when I'm having a hard time getting past. I think, Your Honor, that, you know, I think about it this way. If I'm bringing these claims, I'm thinking about Rule 11. I've got to actually have a viable claim. I have to have it well supported. We well supported this claim. This has to be based on testimony from physicians about the condition, the care needs, all those sorts of things. So this is not some sort of willy-nilly thing where we're just kind of throwing these claims to the state. These are situations where there's a huge delta between what the treating physician is saying is needed and what's actually authorized. And in this case, we've got a policy that ended up being the deciding factor here, not medical necessity, but you didn't document it in the way we wanted it documented. You didn't show a change in condition. And let me put a point in that too. So let's say you have a child who is having all kinds of respiratory congestion. They've got an underlying respiratory issue. And it's very important that we keep their lungs clear. And the doctor has prescribed something in an effort to try and address that. Child comes back in, listening to the lungs, still not clearing it out. Okay, I need to up the dosage. I need to up the treatment. There isn't a change in condition there. The child is still experiencing the respiratory impairment, the congestion. The doctor is adjusting the treatment in order to address that. But there's no change in condition. Under those circumstances, that child, there's no increase. Additionally, we can't always assume they get it right. So if they got the 21 hours wrong and we don't have an ability to come back and say, no, no, no, no, no, this is way off, then that child is left in jeopardy. And I take EPSDT to mean exactly what Congress said it meant, which was we are going to intervene early and often and make sure that these kids have the care they need so that we can maintain their health and prevent it from getting worse. And for kids with chronic conditions like LW, that's the ballgame. It's all about maintaining his care because if we don't, it goes downhill quickly and it could be catastrophic. And I think, you know, to address your concerns, again, we don't bring willy-nilly claims. We're bringing serious stuff. I'm not saying that you do, but I think that, you know, some people would, right? Or I think your point has to be you can't have a rule like this because inevitably it results in the standard of care directed by the statute not being provided, right? You would say you have to have a different rule that says what? Because it can't be you have to have a different rule that whenever the state got it really wrong and nobody realized it at the time, then you can have a claim, right? It has to be a different—it has to be a rule that applies to everybody. Well, I think the problem is we have a rule that applies to everybody that doesn't account for care that's necessary to correct or ameliorate. But that's the standard that always has to apply. And when it isn't applied, when we have a criteria that says, nope, only if there's a change in condition or a new skilled nursing need, then we're not applying that criteria. Could you have a waiting period? Could you say if there's no change in condition, you can't apply for a change for, you know, three months or six months? I don't believe that that is how Congress contemplated the Medicaid Act. They certainly didn't write that in. And granted, I think as laid out in MH, the state has tons of discretion. They have a lot of discretion. But the clear sort of bottom, the limit is always whatever you're doing, because more talks about this in terms of whether or not the state discharged its duty. This is not just, oh, you know, did we do this? It's you have an affirmative obligation to actually ensure that these kids get care and that that care is corrective and ameliorative. And if it isn't, they have a claim. They have an ability to come into court and try and get that fixed. And you would get at any point that's the case, right? Yes. But like I said, you know, as officers of the court, we have to bring viable claims. And there are consequences for bringing claims that are not credible. Well, I mean, there can also be, you know, closer claims or things like that. Sure. Do you know when LW's next periodic review is? I don't. I know that in cases like this where there's an injunction in place, obviously they just keep the hours in place. I'm not clear if they actually do a full review. That actually would be a better question for them. Let me ask you a related question then, is what's going on in the underlying litigation? Is anything happening? This was a preliminary injunction issued with very little record. Is anything happening? No. I think once the state appealed, everything has been stayed. Actually, to be quite honest, the pendency of MH and now the pendency of this case have stayed other cases to see, you know, what the outcome was going to be. What's going on in remand at MH? Were you the lawyer in that case too? I was the lawyer in that case. Yes, Your Honor. In MH, the state has filed a motion to dismiss. And I guess the only, I would just close by saying that I think the evidentiary record is compelling. I think the point you all have made that the state offered nothing. And that typically, you know, that's the other thing, is for the state then to take the position that the judge just, that Judge Thrash simply adopted whatever the treating physician said. That's simply not accurate. That's not appropriate. The judge reviewed the evidence before him. What we put before him was a lot of detailed evidence about this child and his condition and his care needs. What they put before him was nothing. We have a policy. That's the basis for the decision. So in that context, if MH says you have to weigh the evidence and then come to a decision, Judge Thrash did exactly what this court required him to do. And as a result, found for the plaintiff and issued injunctive relief. And we would ask that. Can I ask a question? This is just sort of a sidetrack thing. But, you know, they argue about the bond, about the failure to post bond. And this is the kind of case where judges routinely say you don't have to post a bond. But Judge Thrash didn't even mention that or explain it or provide any rationale whatsoever as to why he wasn't requiring a bond. I mean, what are we supposed to do about that? Well, Your Honor, I can tell you that that issue was briefed by both sides. Shouldn't we just send it back down for Judge Thrash to at least address it, however he may address it? Absolutely. Well, right, because the circuit precedent indicates that the district court has absolute discretion relative to security bond. I will point out that the security bond the state was requesting was effectively would require the parents to pay for the care that they were going to get for their child, which was kind of absurd. There's no clear statement rule for the security bond, right? There's no clear statement rule related to the security bond, is there? Statement rule meaning that the district court has… Meaning that the district court is absolutely required to say something? I mean, the district court is required to consider it, but there are plenty of cases where the district court is required to consider things, but we don't make them outline, you know, every single factor they consider for 3553A or whatever, right? Yes, I think that's true. And like I said, in this case, the issue was fully briefed. He had it before him and didn't require a security bond. All right, thank you very much. Thank you. Mr. Bergerthon. Well, Your Honors, just a few points. Obviously, I agree with Judge Grant that if we could wave a magic wand, we would. This is heartbreaking, and we don't mean to diminish the parents' task here. I do want to address some of the assumptions that were built into Your Honors' questions. If we go with the idea that you can always challenge the hours allotted to you at any point for any reason, then that means that there is no such thing as a policy. And Judge Grant asked about that, and I think I might have been unclear or just answered wrong or misunderstanding your question. Yes, the state can have policies that on the edges can seem to have unfair results. The question is whether they're reasonable. Also, MH didn't say that even if the policy is reasonable, it doesn't matter. You can still have a de novo review individually. The challenge in MH was the application of the policy, and here that's all we're talking about. The burden is on the plaintiffs to prove that there has been a change in condition or even assuming that that's not in place. Their burden is to show that it's medically necessary. All that they did to meet that burden was talk about the parents, the parents' jobs, the parents' availability. That is not meeting the burden. And I think the questions posed to me are, in essence, in some ways flipping the burden and putting it on the state to say, no, that's not the case for X, Y, Z reasons. I think whether they show medical necessity is a different question than whether the policy can exist. Because I think that if the policy can be in place, then even if they did show medical necessity, they wouldn't have a way to win. And it seems like you're resisting that conclusion a little bit. Well, I think it's reasonable for the state to assume that if there is medical necessity, it would manifest itself in a change in condition. I don't think that that's an outrageous position for the state to take. The state says it cannot manifest itself in the parents' schedules changing. And again, how does the state even administer that schedule? Does it say, parent A, you've been working too much overtime. We're going to give you fewer hours. Parent B, you might lose your job. You get more hours. I think, though, what you're saying, though, is getting to the merits. Because say here the mother has said, I slept through the alarm because I was so exhausted. What if instead the parent had chronic fatigue syndrome and literally couldn't wake up and couldn't help their child? I don't think you can say we don't even look at any of that unless there's a change in the child. Unless you're saying, well, in some cases we'll go into this merits determination even if there's no change in the child. I didn't ask that question very clearly at all. It seems like once we're debating whether this family has shown medical necessity or not, we're agreeing that even if there's not a change in condition of the child, there's still a way to challenge medical necessity. I don't think so, Your Honor, because I think that's built into the policy, which assumes that medical necessity has to be manifested by a change in condition. I think it's hard to say that policy is unreasonable. I'm not sure. I really haven't heard an argument throughout the course of the case about why that policy is unreasonable. Really, the whole gist of the suit here is ultimately the initial hours were wrong. We used this way to challenge it that is not really the way to challenge it. But we still get de novo federal court review of that. What if the parents said here that their child's condition has changed because due to the lack of skilled nursing care, sometimes his blood glucose levels are going too low at a much greater rate, and therefore his condition has changed? Would that satisfy it? I think that might be a valid argument because that might show that the treatment is not ameliorating the condition. Our point here is just that that has not been shown. But isn't that a fact? I mean, that's the problem. You keep saying that you introduced no evidence, and the district court made a fact finding that 21 hours was not sufficient. How are we supposed to reverse that? I get your argument about we should just look at the policy. I think that's inconsistent with Moore and inconsistent with MH, but I get your argument that you could somehow win on that. How do you win on us saying that the district court's fact finding that 21 hours was not sufficient is sufficient, even though you introduced no evidence whatsoever? I think, number one, there's no way to disentangle that from the policy. Again, this was a mechanical application of the policy that says you need a change. We weren't disputing the merits of 21 versus 100. All that was at dispute is there's this policy, and the question should be, is that policy reasonable? And we would say the judge can't just engage in free-range fact finding. It has to be consistent with the Medicaid Act. In the Medicaid Act, nowhere in the Act itself, its regulations, focuses on the parent's capabilities. This is my last question because I agree with you to that to a certain extent. But in MH, we said that one of the things you could consider was whether the parents could provide care. So we said, look, Medicaid can decide to reduce skilled nursing hours because the parents can provide care. The flip side of that is that if the parents can't provide care, then you might have to provide more skilled nursing hours. If you want to consider whether the parents can provide the care or not, then that's a consideration that has to be brought out, right? I think what was at issue in MH was a policy. I remember MH. I know what was at issue. It was a class action about policies. Right. That's what we addressed. We didn't address whether any specific individual person that was part of that class was getting the care that they were warranted under the Medicaid Act. Yes, and the department's policy was we're going to first establish medical necessity and then we're going to wean that off because we'll assume that parents learn those skilled tasks. And the court said that's reasonable. I don't think it's built into that. I think it's important to understand the slice of what that's looking at. That is not looking at routine medical tasks. That's not looking at just monitoring. That's not looking at being sure somebody's at home. All those things are parts of the day for a child with serious medical needs. It would be great if there were evidence in the record about any of that. That would be great. If there were evidence in the record about what the nurses did, what was medically necessary for nurses to do versus what the parents could do, any of that would be great. If there were any evidence in the record, if the state had done anything at all to put any evidence in the record about any of that, that would be great. I absolutely take the point. I will just say that that point highlights kind of the disconnect in this argument. This was about a policy. No one is saying that the policy was unreasonable. They're saying we still don't like how it turned out. If you can always look at that, then there's no sense in having policies. The word policy is meaningless. Thank you, Your Honor. All right. Thank you, counsel. And our last case for today is Phinney v. Metropolitan.